# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
November 10, 2015 Session Heard at Greeneville[1]

## STATE OF TENNESSEE v. JOHN RUSSELL GILES, JR.

**Appeal from the Criminal Court for Cumberland County**
**No. 12-0436     Leon C. Burns, Jr., Judge**

_____

**No. E2014-02212-CCA-R3-CD-MARCH 10, 2016**

_____

Following a jury trial, the Defendant, John Russell Giles, Jr., was convicted of premeditated first degree murder and sentenced to imprisonment for life. See Tenn. Code Ann. § 39-13-202. In this appeal as of right, the Defendant contends (1) that the evidence was insufficient to sustain his conviction; (2) that the trial court erred "in refusing to fashion a remedy" for alleged discovery violations made by the State; (3) that the trial court admitted in violation of Tennessee Rule of Evidence 404(b) evidence that, the day before the murder, the Defendant had conducted internet searches for and visited pornographic websites depicting women being raped; (4) that one of the State's witnesses "perjured himself," and the trial court did not allow the witness to be recalled for further cross-examination; and (5) that the State was allowed to argue a time of death that differed from the time of death provided in the bill of particulars.[2] Following our review, we affirm the judgment of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Randal R. Boston, Crossville, Tennessee; and Kevin R. Bryant, Crossville, Tennessee, for the appellant, John Russell Giles, Jr.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Counsel; Bryant C. Dunaway, District Attorney General; and Philip Hatch and Caroline Elizabeth Knight, Assistant District Attorneys General, for the appellee, State of Tennessee.

---

[1] Oral argument was heard in this case on November 10, 2015, in Greeneville, Greene County, Tennessee as part of this court's C.A.S.E.S. (Criminal Appeals Civics Education for Students) project.

[2] For the purpose of clarity, we have renumbered and reordered the issues as stated by the Defendant in his appellate brief.

## OPINION

## FACTUAL BACKGROUND[3]

On November 7, 2012, the Defendant called Cumberland County 911 at 6:05 p.m. and told the operator that he had found his girlfriend, Kimberly Batty, "laying [sic] on the floor" of her living room with "blood on her head." The Defendant stated that he "went to pick her up" but that the victim was "not moving." The Defendant further stated that the victim was "very cold," that he could not feel a pulse "on her throat," and that she was not breathing. The Defendant described to the operator that there was "blood on her couch" and that the victim was on her back with "just barely [any] clothes on." The Defendant then exclaimed, "Oh, God, there's blood on the floor."

The 911 operator asked the Defendant if he wanted to perform CPR on the victim. The Defendant responded that he did and that he would "do anything." The Defendant told the operator that he had performed CPR before "in the military." The operator instructed the Defendant to put one hand on the victim's forehead, to place the other hand "under her," and to "tilt her head back slightly." The operator then instructed the Defendant to "put [his] ear next to her mouth" and listen for any signs that the victim was breathing. The Defendant stated that he had complied with the operator's instructions and that he could not feel or hear any breathing.

Next, the operator instructed the Defendant on "how to give mouth to mouth." The Defendant stated that he was "down over her" and that he could not feel the air "go in and out." Instead, the Defendant stated that the victim's body felt "hard." At that point, the operator instructed the Defendant to perform "chest compressions." During these instructions, the Defendant told the operator that the victim did not "have any clothes on." The operator instructed the Defendant to "pump" the victim's chest thirty times. When the Defendant stated that he had done this, the operator asked him to check in the victim's mouth to see if there was anything blocking her airway. The Defendant stated that he could not get the victim's mouth to open. The Defendant then stated that he could only hear "gurgling" and that "blood [was] coming out of [the victim's] mouth."

The operator instructed the Defendant to continue alternating between chest compressions and mouth to mouth on the victim. After a pause, the Defendant stated, "If my hand gets on - - on the blood, hell, I've got it on me." The Defendant then told the operator that he knew the victim was dead. The operator asked the Defendant if he thought the victim had fallen. The Defendant responded, "No. God, no, not with all this blood." At that point, the operator asked the Defendant if he thought "something's

---

[3] This section will discuss only the factual background regarding the Defendant's conviction. The factual background of the Defendant's procedural issues will be discussed in other portions of this opinion.

happened" to the victim.  The Defendant responded, "Something's happened.  There's blood on the couch.  I fell in it.  And there's blood on the floor.  She had her legs, it looks like (unintelligible).  Can I cover her up?"  The operator told the Defendant to "leave her exactly where she's at," and the Defendant responded, "But she's all naked."  The 911 call ended shortly after this.

Sergeant Charles David Laxton of "Fairfield Glade Security" testified that he was dispatched to escort an ambulance to the victim's residence at approximately 6:10 p.m. on November 7, 2012.  Sgt. Laxton testified that when he arrived at the victim's residence, the Defendant's "small compact van" was parked in the driveway.  As the paramedics entered the house, the Defendant was brought out of the house by an officer who had arrived before Sgt. Laxton.  The Defendant was taken to his van and Sgt. Laxton stayed with him "for a few minutes."  Sgt. Laxton noticed that the Defendant had "just a little bit of blood on his left finger," "a mark of blood on his left check," and "just a little tiny spot on one of his shirt sleeves."  This was the only blood Sgt. Laxton saw on the Defendant.

Sgt. Laxton recalled that the Defendant asked him several times if the victim was dead but that the Defendant "didn't appear to [have] any emotional attachment to anything."  Sgt. Laxton explained that the Defendant "was not crying or anything like that at the time."  Instead, Sgt. Laxton recalled that the Defendant "seemed to be obsessed with . . . wiping blood from his left finger" with a paper towel.  Put another way, Sgt. Laxton thought that the Defendant "appeared to be more concerned than anything about asking [him] if [the victim] was dead and getting the blood off of his hand."

Sgt. Laxton testified that he eventually left the Defendant's van and went into the victim's house.  Sgt. Laxton saw the victim's body lying on the floor of the living room "right in front of the couch."  Sgt. Laxton recalled that there "was a pool of blood under her head" and that her "hair was all disheveled . . . and appeared to be matted up [with] blood."  Sgt. Laxton noticed a "large amount" of what appeared to be blood on the couch.  Sgt. Laxton testified that it appeared to him as if "the outside . . . of the stain had started to dry," suggesting to him that "it had been there for a while."

Investigator Jerry Jackson of the Cumberland County Sheriff's Department testified that he investigated the victim's death with assistance from Special Agent Dan Friel of the Tennessee Bureau of Investigation (TBI).  Inv. Jackson and Agent Friel walked through the victim's house together taking photographs and video of the crime scene.  Inv. Jackson testified that he checked all of the doors to the victim's house and that he did not find any evidence of "forced entry."  Inv. Jackson specifically noted that there was no damage to the victim's front door, but he discovered a "reddish brown stain" between the doorknob and the latch.

The victim's body was found on the floor between a couch and a coffee table. Agent Friel testified that he and Inv. Jackson moved the coffee table to get better access to the victim's body and that when they did so, "all of [the] items [on the table] . . . fell off." A large blood stain was found on the couch next to the victim's body. Both Inv. Jackson and Agent Friel testified that the outer part of the stain had dried while the rest was still wet. Small spots of what appeared to be blood spatter were found on the window blinds and the wall behind the couch. Several small spots of apparent blood spatter were found on the living room floor "a short distance" from the victim's head.

Inv. Jackson opined that the apparent blood spatter was consistent with "cast-off from some type of weapon or something." Inv. Jackson specifically opined that the spot on the window blinds appeared "to be traveling left to right" and "kind of downward." Agent Friel opined that the blood on the blinds, wall, and floor "came from . . . the same act" as the blood found on the couch. Inv. Jackson admitted, however, that it was possible the blood spatter was caused by the victim's head hitting the floor after being dragged off the couch.

Except for her socks, the victim's body was naked from the waist down, and her legs were spread open. The victim's boots "were in a different location than [her] body," and her jeans were found wadded up next to her left leg. The victim's underwear had been cut off at the waist, and the crotch area was found on the floor underneath the victim's genitals. This caused Agent Friel to opine that the underwear had been "cut as she lay right there." However, there were no injuries to the victim's waist or pelvic area. Agent Friel testified that he victim's jeans were cut at the top, "but as you [got] down closer to the legs, it appear[ed] that they [had] been ripped from there." Again, there were no injuries to the victim's waist or legs.

Both the victim's blouse and bra were still on her body when it was found, but they had each "been cut right down the middle" and pushed aside to expose the victim's breasts. However, there were no injuries to the victim's breasts or abdomen. Inv. Jackson testified that he believed the victim's clothes had been cut "with some type of scissors." Agent Friel testified that upon initially viewing the victim's body, he thought he was looking at "a rape scene" and ordered that a "rape kit" be performed on the victim's body and clothes. Subsequent forensic testing by the TBI found no semen in the victim's mouth, vagina, or rectum nor on her jeans, underwear, blouse, or bra. Based upon the negative results of the rape kit, the lack of injuries to the victim's torso and legs, and the positioning of the victim's clothing, Agent Friel opined that the victim's clothing had been cut after she died to make it look like "she'd been raped."

Between the living room and the dining room the investigators found an ironing board and iron. Inv. Jackson noted that the victim's jewelry in her bedroom appeared not to have been disturbed. An umbrella belonging to the Defendant was found in the

-4-

victim's garage approximately five feet from the door. Inside the kitchen, the investigators found a tissue that appeared to be stained with blood and "some blood material" near the kitchen sink. On the bottom of the door leading from the kitchen into a "den area" that connected the kitchen to the garage, the investigators found a small smear of what appeared to be blood.

On the step leading to the kitchen from the den area, the investigators found a single dumbbell. Agent Friel testified that the end of the dumbbell measured three inches by three inches. Inv. Jackson testified that he believed the dumbbell's partner was missing because another complete set of dumbbells was found in the house, all of the victim's shoes "had a pair," and the victim appeared to be "very meticulous and [to have] kept everything organized." Also in the den, the victim's glasses were found sticking out from underneath a clothing rack. Given the presumed missing dumbbell and the location of the victim's glasses, both investigators opined that the victim was attacked in the den area. Agent Friel testified that the presumed second dumbbell was never found and admitted that it was possible the victim only kept one dumbbell on the step leading from the den area into the kitchen. The victim's cell phone was also never found.

The Defendant spoke to the investigators on the night of November 7, 2012, and during the early morning hours of November 8, 2012. Inv. Jackson described the Defendant as having "tried to act upset" that night. Inv. Jackson also claimed that he could "notice when somebody's not acting . . . truthfully" and that the Defendant "didn't seem like . . . he was too sincere." The Defendant stated that he and the victim had started dating in July 2012 and that they typically saw each other "three or four" times a week.

The Defendant claimed that he woke up around 7:00 a.m. on the morning of November 7, 2012, and that he called the victim at approximately 8:00 a.m. Initially, the Defendant told Inv. Jackson that he picked the victim up at her house around 10:30 a.m. and that they went to Walmart, returning around 11:30 a.m. The Defendant stated that he went into the house with the victim, walked her into the kitchen, kissed her goodbye after she told him "she was going to be doing some ironing," and then left through the garage with the victim's closing "the garage door behind him." Later, the Defendant stated that he and the victim never actually went to Walmart because the victim got a phone call "from the termite people" and he had to turn around on the Interstate and take her back home. The Defendant claimed that they arrived around 11:00 a.m. and that he "got his umbrella out and . . . walked [the victim] into the house through the garage." The Defendant further claimed that he left his umbrella in the garage.

The Defendant stated that he went back home after he left the victim's house and that he spoke to his son on the telephone. Initially, the Defendant claimed that he stayed at his home until he left around 6:00 p.m. to pick the victim up for their weekly date.

Later, the Defendant stated that he had gone to a doctor's office around 3:00 p.m. and then to Rite-Aid, Walgreens, and Walmart around 4:00 p.m. The Defendant told Inv. Jackson that, at one of the stores, he had bought a bag of candy and a card that he brought with him to the victim's house. These items were found by the investigators in a chair in the victim's living room. The Defendant stated that he tried calling the victim several times that afternoon but that she never answered.

The Defendant told the investigators that he went back to the victim's house around 6:00 p.m. At no point did the Defendant say anything to the investigators about going back to the victim's house before that time. The Defendant explained to Inv. Jackson that the victim would leave the front door unlocked for him when she was expecting him to come over. The Defendant stated that he found the front door unlocked and entered the house. The Defendant claimed that he found the victim's body "with her left shoulder propped up on the couch." The Defendant stated that he called 911, moved the coffee table, and attempted CPR on the victim.

Sometime in the early morning hours of November 8, 2012, the Defendant consented to a search of his house. Inside the house, the investigators found a bag on the Defendant's table containing lubricant, condoms, latex gloves, a flashlight, a handgun, a box cutter, and a bag of "dog treats." The investigators also noticed some scratches on the Defendant's cheek and took photographs of them. Agent Friel testified that the Defendant claimed he got the scratches while "pruning some trees" at his home.

Inv. Jackson recalled that, initially, the Defendant "kept asking if [the victim] had been raped" and stated that "she would never have sex like that." Later, when asked why he had condoms and lubricant in his bag, the Defendant stated that the victim "wanted to have anal sex, but [that] he didn't want to." The Defendant also claimed that the victim "wanted him to rape her, but [that] he would not." The Defendant further claimed that the victim "flirted a lot with men and wore tight clothing." The Defendant then told Inv. Jackson that the victim "enjoyed having sex and sometimes the sex was rough." The Defendant explained that the victim liked "putting her legs in the air and being pounded." Inv. Jackson recalled that the Defendant "became upset" when he was asked "if he was a jealous man."

On November 11, 2012, Sgt. Laxton was patrolling in Fairfield Glade when he spotted "a small gray car" meandering through the neighborhood. Sgt. Laxton stopped the car and saw the Defendant sitting in the passenger seat. The car's driver told Sgt. Laxton that they were "just riding around." Sgt. Laxton let the men go, and they left the area. On November 12, 2012, the Defendant's house was searched again, and a computer was seized. Agent Friel recalled that during the search, the Defendant "pulled up in . . . [a] white van" and that there was "a Volkswagon [c]onvertible with a red top and a slate-gray colored body" parked in his driveway.

Also on November 12, 2012, the Defendant came to the Cumberland County Sheriff's Department wanting to speak to the investigators. The Defendant claimed "that when he first picked [the victim] up" on November 7, 2012, he saw her standing on her dining room table "trying to change a light bulb in the chandelier." The Defendant further claimed that the victim slipped, fell off the table, and scratched his arm; therefore, "his DNA [was] possibly . . . under her fingernails." Inv. Jackson testified that he thought this was odd because the "chandelier hung down" low and that "there would be no reason to be standing on the table to change the light bulb." The Defendant also asked Inv. Jackson if "he was the only suspect." Inv. Jackson testified that he responded by asking the Defendant if "he could eliminate himself as a suspect" and that the Defendant said that he could not. The Defendant was also asked "what he would be afraid of if he'd committed [the] crime," and he responded, "getting caught."

Carol Donalson testified that she was a licensed professional counselor and the executive and clinical director of the Christian Counseling Center of Cumberland County. Ms. Donalson further testified that her focus was on "couples or relationship counseling." Ms. Donalson recalled that she received a phone call from the victim on October 22, 2012, to schedule an appointment for relationship counseling on November 7, 2012, at 12:30 p.m. Ms. Donalson also put the Defendant down for that appointment because it was typically her practice to ask "both people" to attend "the first session or two," but she had no idea whether the Defendant would actually come to the appointment. Ms. Donalson testified that the victim never showed up for her appointment.

Joy Miller testified that on November 7, 2012, she lived across the street from the victim. Ms. Miller recalled that sometime after 12:30 p.m., she went to her mailbox "to put a letter in it." Ms. Miller testified that she was sure of the time because she "watched [her] soap opera . . . from 11:30 to 12:30." While at her mailbox, Ms. Miller saw a white van pull into the victim's driveway. Ms. Miller testified that she had seen the van before "two or three times a week" at the victim's house. Ms. Miller briefly spoke to the man, whom she described as being tall with gray hair, before she went back into her house. Ms. Miller also recalled having seen the man and the victim in a red and gray convertible at some point in the past. Ms. Miller then went to the grocery store and recalled that the van was gone when she got back home at 2:30 p.m.

William Ross Crabtree testified that in March 2013, he "was booked into the Cumberland County jail for failure to pay child support" and put in the same cell with the Defendant. Mr. Crabtree claimed that after a day together as cellmates, the Defendant told him that the investigators were "butthole[s]." The Defendant then said that "he didn't mean to kill [the victim], but he did" by hitting "her in the back of the head." Mr. Crabtree claimed that the Defendant did not tell him what he used to hit the victim, but that he said the "it was disposed of, but [that] it was not far away." Mr. Crabtree further

claimed that he overheard the Defendant talking with another inmate about Lake St. George. Agent Friel testified that there was a Lake St. George Marina "on the way to" the victim's house.

Mr. Crabtree testified that a few nights later, the Defendant stated that "he had told [Mr. Crabtree] too much, and if [Mr. Crabtree] told anybody, [the Defendant] would have to kill [him]." It was at that point that Mr. Crabtree asked to be moved and to speak to Agent Friel. Mr. Crabtree admitted that he had a prior felony conviction and that at the time of his arrest he owed over $20,000 in child support. However, Mr. Crabtree claimed that he no longer owed any child support because he was proven not to be the father of the child. Mr. Crabtree also admitted that he was ordered to serve 180 days in jail but was released after having only served twenty-two days and shortly after speaking to Agent Friel. However, Mr. Crabtree claimed that he was released because he had an excuse for missing his court date.

The victim's phone records were introduced at trial. The records showed that the victim received several text messages from the Defendant on November 6, 2012, in which he expressed his love for her. At 9:18 a.m. on November 7, 2012, the Defendant sent the victim a text message asking her how much she loved him. The Defendant sent another text message to the victim that day at 2:39 p.m., which asked her to call him and stated that he would be at her house at 6:30 p.m. In addition to the text messages, several voicemails from the victim's voicemail inbox were played for the jury. Two messages from August 2012 were played in which the Defendant sang and proclaimed his love for the victim.

On November 7, 2012, the victim received messages from an acquaintance at 12:31 p.m. and a pharmacy at 1:06 p.m. At 1:17 p.m., the Defendant left the first of three voicemails to the victim. In the first message, the Defendant stated that the victim was "supposed to call" him and asked her to do so. He also stated that he would pick her up "around 6:00." Another acquaintance left a voicemail for the victim at 2:11 p.m. The Defendant left a second message at 2:28 p.m. telling the victim that she was "starting to worry [him] a little bit" and asking her to call him. The Defendant left a third message at 4:03 p.m. The Defendant stated that the victim "must be doing a lot of ironing" and that he wished she would call him. The Defendant then stated that he was going to the doctor's office to "get a prescription" and that he would then go to her house "a little bit early."

John Michael Rowe, an executive relations analyst for Verizon Wireless, testified regarding the victim's cell phone records. Mr. Rowe explained that when a cell phone sends or receives a call, it "transmits a signal to a cell site" and that data is recorded and kept by the cell phone provider. Mr. Rowe further explained that each cell site was "divided up into at least three different sectors," each referred to as a "cell face." Each

cell site would cover a different geographical area, and each cell face would cover a different portion of that area. Mr. Rowe testified that, generally, when the cell phone records show that a phone transmitted to a particular cell site and cell face at one point in time and then later to a different cell site or cell face, it means that the phone has been physically "moved." However, Mr. Rowe admitted that sometimes when there is "heavy call traffic," calls can be moved from one cell site or cell face to another without the phone's physically moving.

In addition to Mr. Rowe's testimony, Robert Rosenblatt, a criminal intelligence analyst with the Regional Organized Crime Information Center, testified that he used the cell phone records provided by Mr. Rowe to make several maps showing the homes of the victim and the Defendant, along with the geographic location covered by several cell sites and cell faces. Mr. Rosenblatt admitted he had no expertise in cell phones and that he simply entered the information into a computer program in order to produce the maps. Mr. Rosenblatt further admitted that the prosecutors discovered errors on the first set of maps he had produced and that he had to make a new set shortly before trial. Mr. Rosenblatt characterized the flawed maps as being the product of "user error."

Both the cell phone records and the maps made by Mr. Rosenblatt were introduced into evidence at trial. Mr. Rowe testified that all of the phone calls received or sent from the victim's phone from 7:51 a.m. to 12:31 p.m. on November 7, 2012, used the same cell site and cell face, cell site 461, cell face 4. This particular cell site and cell face covered an area that included the location of the victim's home. Meanwhile, the Defendant's cell phone transmitted from two different cell sites on the morning of November 7, 2012, cell site 550, cell face 4, and cell cite 461, cell face 2. Both of these covered an area that included the location of the Defendant's home but not the victim's home. Contrary to the Defendant's statement to the investigators, the victim's cell phone records did not reflect that she received a phone call at 11:00 a.m. However, there was a call from the victim's friend, Sandra Richman, received at 10:43 a.m., which used cell cite 461, cell face 2, like all of the other calls sent or received by the victim's cell phone that morning.

Beginning at 1:07 p.m., the victim's phone began transmitting to different cell sites and cell faces. At 1:07 p.m., the victim's phone was recorded as transmitting to cell site 550, cell face 4. When the Defendant left his voicemail message to the victim at 1:17 p.m., both his and the victim's cell phones transmitted to cell site 461, cell face 2. When the Defendant left his second message at 2:28 p.m., both his and the victim's cell phones were shown to have transmitted again to cell site 461, cell face 2. The Defendant's third message was left at 4:03 p.m., and the records reflected that both the victim and the Defendant's cell phones transmitted to cell site 375, cell face 2, which covered part of the city of Crossville and did not include either the Defendant or the victim's homes. Based upon the fact that the victim's cell phone began transmitting to different cell sites and cell

faces, Mr. Rowe opined that the victim's phone was "moved" sometime before 1:07 p.m. and was in "a completely different location." When the Defendant called 911 shortly after 6:00 p.m. that evening, his cell phone transmitted to cell site 461, cell face 4.

TBI Special Agent Douglas Williams testified that he worked in the TBI's Technical Services Unit. Agent Williams testified that another agent conducted the forensic examination of the Defendant's computer, but that agent was out of the country at the time of trial. Agent Williams reviewed the agent's report and was prepared to testify about its contents. The forensic examination of the computer revealed that on October 6, 2012, the Defendant conducted several internet searches about reading "other people's text messages" and how to "read someone's text messages online." Additionally, after the victim's death, the Defendant conducted several internet searches in November and December 2012 for information on the victim's death, "information on [the] murder of" the victim, and whether the victim's body was cremated. Agent Williams also testified that the forensic examination of the computer revealed that the day before the murder, November 6, 2012, the Defendant spent fifteen minutes conducting several internet searches and visiting eleven pornographic websites depicting women being raped.

Ben Gibson testified that he was the investigator for the Cumberland County Medical Examiner. Mr. Gibson testified that he arrived at the victim's house at approximately 9:00 p.m. on November 7, 2012. Mr. Gibson recalled that he thought it was "odd" that the victim's body was just "laying [sic] there" while the rest of the room was "kind of pristine" and there were no signs "of struggle." Mr. Gibson noted that the victim's body "was cool to [the] touch" and that there was blood in the victim's nose. Mr. Gibson also noted that lividity, the pooling of blood inside the body after death, had begun to set in "in the back of [the victim's] head."

Mr. Gibson testified that when he examined the victim's body, he noticed that rigor mortis had set in to her jaw, elbows, and hands. Mr. Gibson explained that rigor mortis could set in "within three hours" if there were "pristine conditions." Mr. Gibson testified that the blood on the floor had started to dry and that "there was a little bit of clotting" in the area of the victim's wounds. Mr. Gibson opined that this was "kind of normal for a body being there for a little bit." Mr. Gibson also testified that there "was a substantial amount of blood on [his] hands" after he touched the victim's head. Mr. Gibson believed that if someone had attempted CPR on the victim's body, they would have gotten blood on their hands, face, and clothing.

Dr. Thomas Deering testified as an expert in forensic pathology. Dr. Deering performed an autopsy on the victim's body. Dr. Deering began the autopsy by examining the outside of the victim's body. Dr. Deering noted that three of the victim's artificial nails were broken on her right hand and four were broken on her left hand. Dr. Deering

also noted that there were a few minor bruises on the victim's hands, wrists, and upper left arm. However, there were no injuries to the victim's torso, abdomen, thighs, or legs. Just below the victim's lower lip, there was an abrasion and bruising. Two more abrasions and a large bruise were found on the right side of the victim's chin.

Dr. Deering testified that he found a laceration on "the left back of the [victim's] head" and "a bruise associated with it." Dr. Deering opined that the laceration was caused by blunt trauma, explaining that "when something has struck the body with enough force that the skin can't hold all the force, . . . it rips" the skin. Dr. Deering found a more severe laceration on the back of the victim's left ear. There was a deep bruise on the victim's ear, and the laceration to its back "tore" part of the ear. Dr. Deering testified that underneath the victim's left ear, he found "a large circular fracture" to the victim's skull. The fracture measured three inches by three inches, like the end of the dumbbell found in the victim's den. Dr. Deering opined that the victim had been struck with something larger than a hammer and that the injuries were "consistent with" having been struck by the dumbbell, but he could not conclusively "say that [it was] the object that caused" the victim's injuries.

Dr. Deering testified that the victim's left ear was hit with such force that it not only fractured the victim's skull, but it indented the skull and caused a fracture to radiate "all the way across the back of the" skull. The blow caused subdural and subarachnoid hemorrhages and was so forceful that it bruised and caused a "small tear" in the victim's brain. Dr. Deering also testified that the blow fractured the victim's left jaw. Dr. Deering explained that this was evidenced by a "split" in the victim's lower left teeth and blood "in the tissue underneath" her lower teeth. The severity of the blow also caused several "bite hemorrhages" on the right side and the tip of the victim's tongue.

Dr. Deering found "faint" bruising to the victim's neck. Dr. Deering also found petechiae, "little purple and red dots" caused by the small capillaries rupturing, in both of the victim's eyes. Dr. Deering explained that petechiae are often found in cases of asphyxiation. Dr. Deering examined the victim's larynx and found bruising in the muscles around it. Inside the victim's larynx, Dr. Deering found "cracked" and bruised cartilage along with some bleeding. Based upon these injuries, Dr. Deering concluded that the victim suffered manual strangulation in addition to the blunt force trauma to her head. Dr. Deering characterized the outside signs of strangulation as being "subtle," but the internal signs were "not very subtle."

Dr. Deering opined that the blow to the victim's left ear was "moderate to severe" and could have been fatal. However, given the petechiae and the bruising and bleeding in and around the victim's larynx, Dr. Deering opined that the victim was still alive when she was strangled. Dr. Deering further opined that it was very likely that the victim was rendered unconscious after the blow to her head and that there was not "a lot of [evidence

of] struggle [or] fight" during the strangulation. Dr. Deering concluded that the victim's cause of death was a combination of "blunt force injuries to the head and strangulation to the neck."

TBI Special Agent Jennifer Shipman testified as an expert in serology and DNA analysis. Agent Shipman examined the victim's jeans and found the victim's DNA and DNA from a second contributor, but she was unable to create a profile for the second contributor. Agent Shipman testified that samples from the victim's kitchen and the tissue found in the victim's kitchen tested positive for the victim's blood. The scrapings from the victim's left fingernail tested positive for the victim's DNA and a second contributor, but Agent Shipman was unable to create a DNA profile for the second contributor. The scrapings from the victim's right fingernail tested positive for a mixture of DNA from two people. Agent Shipman was able to determine that one of the people was a male, but she could not create an identifiable DNA profile for either contributor.

Following questioning by the trial court, the Defendant elected not to testify at trial. The Defendant presented evidence to establish that on November 7, 2012, he was at a Walmart at approximately 4:30 p.m., a Walgreens at 4:38 p.m., and a Rite-Aid at 5:07 p.m. The Defendant also presented a private investigator who testified that, in her estimation, it took twenty minutes to drive from the Defendant's house to his doctor's office and nineteen minutes to drive from Crossville to the victim's house. Agent Friel testified that it was approximately 4.2 miles from the Defendant's house to the victim's house.

Based upon the foregoing evidence, the jury convicted the Defendant of premeditated first degree murder. This timely appeal followed.

## ANALYSIS

### I. Sufficiency of the Evidence

The Defendant contends that the evidence was insufficient to sustain his conviction for premeditated first degree murder. The Defendant argues only that "[b]ased on the proof presented at trial the evidence was insufficient to sustain a conviction." The State responds that the evidence was sufficient to sustain the Defendant's conviction.

### A. Waiver

The Defendant's argument with respect to this issue is limited to a brief recitation of the standard of review and the single, conclusory sentence quoted above. Such woefully inadequate briefing typically results in the waiver of the issue before this court.

See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument . . . will be treated as waived in this court").

Furthermore, the Defendant argues that, for convictions "based entirely upon circumstantial evidence," the facts must be "so clearly interwoven and connected that the finger of guilt is pointed unerringly at the [d]efendant and the [d]efendant alone." This was the standard of review enunciated by our supreme court in State v. Crawford, 470 S.W.2d 610 (Tenn. 1971). However, our supreme court expressly overruled this standard over five years ago in State v. Dorantes, 331 S.W.3d 370 (Tenn. 2011).

This court is troubled by the antediluvian attitude taken by some defense attorneys in this state who continue to cite to the Crawford standard despite the fact that it has not been the law in Tennessee for over five years. See State v. Tavarus Detterio Griffin, No. W2014-02114-CCA-R3-CD, 2015 WL 7833205, at *8 n.4 (Tenn. Crim. App. Dec. 3, 2015), perm. app. filed (Tenn. Feb. 1, 2016); State v. Shelby Lesean Harris, No. M2014-01706-CCA-R3-CD, 2015 WL 6748259, at *6 n.1 (Tenn. Crim. App. Nov. 5, 2015); State v. Morris Marsh, No. E2013-01343-CCA-R3-CD, 2014 WL 4366087, at *20 n.4 (Tenn. Crim. App. Sept. 4, 2014), perm. app. denied (Tenn. Feb. 19, 2015); State v. Deborah Davis, No. E2011-01519-CCA-R3-CD, 2012 WL 6727512, at *11 (Tenn. Crim. App. Dec. 27, 2012) (citing other examples), perm. app. denied (Tenn. May 8, 2013).

Nevertheless, given the severity of the Defendant's conviction and the importance of the issue, we will address this issue on the merits in spite of these deficiencies in the Defendant's brief.

### B. Standard of Review

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence, rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Bland, 958 S.W.2d at 659; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). A guilty verdict "may not be based solely

upon conjecture, guess, speculation, or a mere possibility." State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). However, "[t]here is no requirement that the State's proof be uncontroverted or perfect." State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Put another way, the State is not burdened with "an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 326.

The foregoing standard "applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Our supreme court has held that circumstantial evidence is as probative as direct evidence. Dorantes, 331 S.W.3d at 379-81. In doing so, the supreme court rejected the previous standard which "required the State to prove facts and circumstances so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." Id. at 380 (quoting Crawford, 470 S.W.2d at 612) (internal quotation marks omitted).

Instead, "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Dorantes, 331 S.W.3d at 381. The reason for this is because with both direct and circumstantial evidence, "a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference." Id. at 380 (quoting Holland v. United States, 348 U.S. 121, 140 (1954)). To that end, the duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011). Additionally, the identity of the perpetrator "is an essential element of any crime." State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006). However, the perpetrator's identity "may be established solely on the basis of circumstantial evidence." State v. Lewter, 313 S.W.3d 745, 748 (Tenn. 2010).

Premeditated first degree murder is defined as "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a).

> Premeditation is an act done after the exercise of reflection and judgment. Premeditation means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time.

Tenn. Code Ann. § 39-13-202(d) (internal quotations omitted).

-14-

The element of premeditation only requires the defendant to think "about a proposed killing before engaging in the homicidal conduct." State v. Brown, 836 S.W.2d 530, 541 (Tenn. 1992). The presence of premeditation is a question for the jury and may be established by proof of the circumstances surrounding the killing. Bland, 958 S.W.2d at 660. Our supreme court has held that factors determining the existence of premeditation include, but are not limited to, the following: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, destruction or secretion of evidence of the killing, and calmness immediately after the killing. See State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003); Bland, 958 S.W.2d at 660. Additional factors cited by this court from which a jury may infer premeditation include the lack of provocation by the victim and the defendant's failure to render aid to the victim. See State v. Lewis, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000).

*C. Sufficiency*

There is overwhelming circumstantial evidence that the Defendant intentionally and premeditatedly killed the victim. The Defendant was the last person known to have seen the victim alive and "discovered" her body. In addition to several other inconsistencies, the Defendant told investigators initially that he left the victim's house at 11:30 a.m. but later told them that he left around 11:00 a.m. after the victim got a phone call and they had to go back home. However, the victim's phone records showed that she never received a phone call at 11:00 a.m. Furthermore, the victim's neighbor, Ms. Miller, testified that she saw a person, whom she had seen the victim with on numerous occasions, and who matched the Defendant's description and was driving a white van like the Defendant's, in the victim's driveway shortly after 12:30 p.m. At no point did the Defendant say anything to the investigators about going back to the victim's house before 6:00 p.m. Additionally, the victim had scheduled a couple's counseling session with Ms. Donalson for 12:30 p.m. that day, but neither she nor the Defendant showed up for the appointment.

The Defendant claimed that he had attempted CPR on the victim when he discovered her body and said to the 911 operator that he had fallen in the blood on the floor and gotten it on his hands. However, Sgt. Laxton testified that the Defendant had very little blood on him, and Mr. Gibson testified that anyone who had attempted CPR on the victim's body would have likely gotten blood on their hands, face, and clothing given the victim's injuries and the pool of blood on the floor. The Defendant also claimed that he had moved the coffee table by the victim's body in order to attempt CPR. But when Inv. Jackson and Agent Friel moved the table, in order to get better access to the victim's

body, everything "fell off" of it. Both Sgt. Laxton and Inv. Jackson testified that the Defendant seemed detached and not "too sincere" on the night of the murder.

The victim's clothing had been cut off, and her body was left lying exposed with her legs spread open. However, the results of a subsequent rape kit were negative, and there were no injuries to the victim's torso or legs, which caused Agent Friel to opine that the victim's clothing was cut off after she died in order to make it appear that "she'd been raped." The day before the murder, the Defendant spent fifteen minutes conducting several internet searches for and viewing several pornographic websites depicting women being raped. In his interviews with the investigators, the Defendant repeatedly asked if the victim had been raped and attempted to blame the victim by suggesting, in lurid detail, that she was sexually promiscuous and aggressive. During a search of the Defendant's residence, the investigators found a bag containing lubricant, condoms, latex gloves, a flashlight, a handgun, a box cutter, and a bag of "dog treats."

On the night of the murder, investigators noticed that the Defendant had scratches on his face. The Defendant claimed that he had scratched his face while "pruning some trees." However, seven of the victim's artificial fingernails were broken. A few days after the murder, the Defendant sought out the investigators to tell them that the victim had fallen off of her dining room table while trying to change a light bulb in the chandelier and scratched him; therefore, "his DNA [was] possibly . . . under her fingernails." Inv. Jackson testified that he thought this was odd because the chandelier "hung down" low and "there would be no reason to be standing on the table to change the light bulb."

Furthermore, the victim's cell phone transmitted to cell site 461, cell face 4, which covered an area that included the victim's home, for all of the phone calls received or sent between 7:51 a.m. and 12:31 p.m. on November 7, 2012. Beginning at 1:07 p.m., the victim's cell phone began transmitting to different cell sites and cell faces. When the Defendant left the victim voicemails at 1:17 p.m. and 2:28 p.m., both his and the victim's cell phones transmitted to cell site 461, cell face 2, which covered an area that did not include the victim's home. When the Defendant left a third voicemail at 4:03 p.m., both his and the victim's cell phones transmitted to cell site 375, cell face 4, which covered a portion of the city of Crossville. However, when the Defendant called 911 from the victim's home, his cell phone transmitted to cell site 461, cell face 4.

Investigators found a single dumbbell, the end of which measured three inches by three inches, on a step leading from the victim's den into her kitchen. The victim suffered "a large circular fracture" to her skull measuring three inches by three inches. Dr. Deering opined that the blow to the victim's head likely rendered her unconscious and could have been fatal, but that prior to her death, she was strangled. Dr. Deering concluded that the victim died from a combination of "blunt force injuries to the head and

strangulation to the neck." Mr. Crabtree testified that while he was the Defendant's cellmate, the Defendant confessed to killing the victim by hitting "her in the back of the head." Mr. Crabtree further claimed that the Defendant had said that the murder weapon was "disposed of" and that he overheard the Defendant talking with another inmate about a nearby lake. Based upon the foregoing, we conclude that the evidence was sufficient to sustain the Defendant's conviction for premeditated first degree murder.

## II. Discovery Violation

The Defendant contends that the trial court erred "in refusing to fashion a remedy" for alleged discovery violations made by the State. The Defendant's entire argument with respect to this issue consists of the following sentences: "The State failed to promptly disclose discovery which unduly prejudiced the Defendant in this case . . . . No relief was granted by the trial court which failure [sic] prejudiced [the] Defendant." The Defendant does not specify what evidence the State allegedly failed to "promptly disclose," how he was prejudiced by this alleged discovery violation, or what remedy the trial court should have imposed. The State responds that the Defendant has waived this issue due to the inadequacy of his appellate brief.

Our review of this issue is hampered by deficiencies in the Defendant's brief and the trial record. The Defendant makes no references to the trial record in his brief, but he does refer to a "motion to compel" filed in November 2013. The motion outlines that the Defendant had filed three separate motions for a bill of particulars,[4] that the State had only responded to two of these motions, that the Defendant had filed a motion for "specific discovery" regarding "autopsy photographs and Emergency Medical Services' reports," and that the State had "failed to comply with these requests." It is also apparent from the record that the Defendant filed a motion to exclude any evidence not provided to the Defendant prior to February 28, 2014. However, this motion was not included in the record on appeal. In denying the Defendant's motion to exclude, the trial court concluded that there was no proof that the Defendant had been prejudiced by the lateness of the State's discovery responses and that everything provided to the Defendant after February 28, 2014, was "not new evidence."

As stated above, the Defendant's brief regarding this issue is limited to a few conclusory sentences and contains no citations to the record. As such, the Defendant has waived direct appellate review of this issue. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument . . . or appropriate references to the record will be

---

[4] It appears that the Defendant repeatedly filed motions for a bill of particulars for use as a discovery device despite the fact that it is well settled in this state that a "bill of particulars is not a discovery device." State v. Sherman, 266 S.W.3d 395, 409 (Tenn. 2008).

treated as waived in this court"). As such, we review this issue solely to determine if plain error review is applicable.

The doctrine of plain error applies when all five of the following factors have been established:

(a) the record must clearly establish what occurred in the trial court;
(b) a clear and unequivocal rule of law must have been breached;
(c) a substantial right of the accused must have been adversely affected;
(d) the accused must not have waived the issue for tactical reasons; and
(e) consideration of the error must be "necessary to do substantial justice."

State v. Page, 184 S.W.3d 223, 230-31 (Tenn. 2006) (quoting State v. Terry, 118 S.W.3d 355, 360 (Tenn. 2003)) (internal brackets omitted). "An error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." Id. at 231.

Here, plain error review is not warranted because the Defendant has failed to show that a clear and unequivocal rule of law was breached. Page, 184 S.W.3d at 230. Tennessee Rule of Criminal Procedure 16(d)(2) provides as follows:

If a party fails to comply with this rule, the court may:
(A) order that party to permit the discovery or inspection; specify its time, place, and manner; and prescribe other just terms or conditions;
(B) grant a continuance;
(C) prohibit the party from introducing the undisclosed evidence; or
(D) enter such other order as it deems just under the circumstances.

"A trial court has wide discretion in fashioning a remedy for non-compliance with a discovery order, and the sanction should fit the circumstances of the case." State v. Downey, 259 S.W.3d 723, 737 (Tenn. 2008).

Additionally, whether "a defendant has been prejudiced by the State's failure to disclose information is a significant factor in determining an appropriate remedy." State v. Gann, 251 S.W.3d 446, 457 (Tenn. Crim. App. 2007). Generally, "[e]xclusion of evidence is a 'drastic remedy and should not be implemented unless there is no other reasonable alternative.'" Id. (quoting State v. Smith, 926 S.W.2d 267, 270 (Tenn. Crim. App. 1995)). Based upon our review of the record, the State provided the Defendant with the evidence at issue in his motion to compel and other discovery motions. There is nothing in the record to suggest that the Defendant requested a continuance due to the lateness of the State's discovery responses. Likewise, there is no evidence in the record

that the Defendant was prejudiced by the slowness of the State's discovery responses. Accordingly, we conclude that this issue is devoid of merit.

## *III. Rule 404(b) Evidence*

The Defendant contends that the trial court admitted evidence in violation of Tennessee Rule of Evidence 404(b) that, the day before the murder, the Defendant had conducted several internet searches for and visited pornographic websites depicting women being raped. The Defendant argues that evidence that he "staged" the crime scene to make it appear that the victim was raped, thereby deflecting suspicion from himself, could not be offered to show his intent to commit the murder because the staging of the crime scene occurred after the offense. The Defendant, therefore, concludes that the evidence of his internet history was propensity evidence with no probative value and was outweighed by the danger of unfair prejudice. The State responds that the evidence of the Defendant's internet history was offered to show his intent to commit the murder, that the trial court complied with the procedural requirements of Rule 404(b), and that the danger of unfair prejudice did not outweigh the probative value of the evidence.

During Agent Williams's testimony, the Defendant objected when the State asked if the forensic examination of the Defendant's computer revealed evidence that the Defendant had conducted internet searches for or viewed pornographic websites depicting women being raped. During a jury-out hearing, Agent Williams testified about the report and said that the Defendant had searched for and viewed rape pornography in September, October, and November 2012. After Agent Williams's jury-out testimony, the trial court concluded that "[k]nowledge of rape [was not] a material issue" because this case involved a homicide and that "the prejudicial impact [was] greatly outweigh[ed] [by] the probative value."

The next day of trial, the State asked the trial court to reconsider its ruling. The trial court then concluded that evidence of the Defendant's having viewed rape pornography was "not bad act testimony" and that Rule 404(b) did not apply. The trial court further concluded that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice; therefore, the evidence was admissible pursuant to Tennessee Rule of Evidence 403. See Tenn. R. Evid. 403 (providing that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice").

The trial court then held, in the alternative, that the evidence would also be admissible under Rule 404(b). The trial court stated that the evidence was not simply propensity evidence but was being offered on the material issues of intent and "knowledge of a rape scene." The trial court further stated that proof of the act was clear and convincing. Regarding the probative value of the evidence, the trial court concluded

-19-

that it was "highly probative on the issues . . . of intent and premeditation." The trial court further concluded that the danger of unfair prejudice did not outweigh the probative value of the evidence, especially "in light of the fact" that the websites visited by the Defendant would not be shown to the jury. Additionally, the State limited its questioning of Agent Williams to the Defendant's internet activities on November 6, 2012, the day before the murder.

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person's actions were in conformity with the character trait. Tenn. R. Evid. 404(b). This rule "is based on the recognition that such evidence easily results in a jury improperly convicting a defendant for his or her bad character or apparent propensity or disposition to commit a crime regardless of the strength of the evidence concerning the offense on trial." State v. Rickman, 876 S.W.2d 824, 828 (Tenn. 1994) (citing Anderson v. State, 56 S.W.2d 731 (Tenn. 1933)). The danger of a jury improperly convicting a defendant based on the defendant's character rather than the evidence presented at trial "particularly exists when the conduct or acts are similar to the crimes on trial." Id. (citing State v. Parton, 694 S.W.2d 299, 303 (Tenn. 1985)).

Accordingly, Rule 404(b) is generally one of exclusion, but exceptions to the rule may occur when the evidence of the otherwise inadmissible conduct is offered to prove the motive of the defendant, identity, intent, the absence of mistake or accident, opportunity, or a common scheme or plan. State v. Tolliver, 117 S.W.3d 216, 230 (Tenn. 2003); State v. McCary, 119 S.W.3d 226, 243 (Tenn. Crim. App. 2003). In addition to these exceptions, evidence of other acts may be admitted to provide the jury with necessary contextual background. State v. Gilliland, 22 S.W.3d 266, 272 (Tenn. 2000); see also Neil P. Cohen et al., Tennessee Law of Evidence § 4.04[13] (6th ed. 2011) (stating that evidence may be admissible to tell the "complete story").

Rule 404(b) requires the court to hold a jury-out hearing regarding the admissibility of specific instances of conduct "upon request." Tenn. R. Evid. 404(b)(1). In order to determine the admissibility of another bad act, the trial court should consider the following three factors: (1) whether a material issue other than conduct conforming with a character trait exists supporting admission of the other act; (2) whether proof of the other act is clear and convincing; and (3) whether the probative value of the evidence is not outweighed by the danger of unfair prejudice. Tenn. R. Evid. 404(b)(2)-(4). If these three threshold factors are met, the evidence may be admitted. We review a trial court's ruling on evidentiary matters under Rule 404(b) for an abuse of discretion, provided that the trial court has substantially complied with the procedural prerequisites of the rule. State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997). Here, there is no

dispute that the trial court complied with the procedural prerequisites of the rule and that its ruling is entitled to review under the abuse of discretion standard.

Our supreme court has recognized that "[w]hile using adult pornography is not a 'crime,' many people consider it a moral 'wrong.'" State v. Clark, 452 S.W.3d 268, 289 (Tenn. 2014). Therefore, "pornography use has such prejudicial potential that it should be addressed through Rule 404(b)." Id. To the extent that the trial court ruled that Rule 404(b) was not applicable to the Defendant's pornographic internet history, it was in error. However, Rule 404(b) is not limited to excluding prior wrongs or bad acts. It also allows for "the introduction of evidence of subsequent acts to establish one's intent during a prior act in appropriate cases." State v. Elkins, 102 S.W.3d 578, 584 (Tenn. 2003). Furthermore, this court has previously held that evidence "of efforts to conceal the crime . . . [are] highly probative to establish the intent of a perpetrator." State v. Hector J. Jauregui, No. E2006-00868-CCA-R3-CD, 2007 WL 2700057, at *11 (Tenn. Crim. App. Sept. 17, 2007).

Contrary to the Defendant's argument, evidence that he planned and carried out staging the crime scene to make it appear that the victim had been raped in order to deflect suspicion from himself was highly probative of the Defendant's intent to kill the victim. Additionally, the Defendant was not on trial for a sex crime, which would have increased the danger that "a jury may infer from a defendant's use of pornography that the defendant had the propensity to engage in other morally questionable sexual behaviors." Clark, 452 S.W.3d at 289. In fact, the negative results of the rape kit, the placement of the victim's clothing, and the lack of injuries to her torso or legs all suggested that the victim was not raped. Accordingly, we conclude that the trial court did not abuse its discretion in concluding that evidence of the Defendant's internet history was admissible under Rule 404(b).

*IV. False Testimony*

The Defendant contends that Mr. Crabtree "perjured himself" and that the trial court did not allow the witness to be recalled for further cross-examination. However, the Defendant's argument focuses on the State's "affirmative duty to correct the false testimony." The State responds that the trial court did not prevent the Defendant from recalling Mr. Crabtree and that the Defendant has failed to show "that any testimony related to [Mr.] Crabtree's child support was material."

During the cross-examination of Mr. Crabtree, the following exchange occurred:
[Defense counsel]: How much do you owe in child support, sir?
[Mr. Crabtree]: Well, now, I don't owe none.
[Defense counsel]: Are you out, paid up completely?
[Mr. Crabtree]: Because the baby was proven not mine.

[Defense counsel]: Okay. But at the time you were arrested, what did they say you owed?
[Mr. Crabtree]: [$20,000].
[Defense counsel]: [$20,000]?
[Mr. Crabtree]: Uh-huh.
[Defense counsel]: When did they prove that this baby wasn't yours?
[Mr. Crabtree]: July [2013].
[Defense counsel]: July of when?
[Mr. Crabtree]: Last year.

A short time later, the following brief exchange occurred:

[Defense counsel]: So you're behind [$22,000] in child support?
[Mr. Crabtree]: I'm not behind none.
[Defense counsel]: Good. You were then?
[Mr. Crabtree]: That's what they said.

At a subsequent break in the proceedings, defense counsel informed the trial court that Mr. Crabtree had "kindly [sic], seriously perjured himself on the stand" regarding the claim that he did not owe any child support and that the child was not his. Defense counsel said that the State did not know "anything about it at all" at the time Mr. Crabtree testified, but he was going to issue a new subpoena for Mr. Crabtree to be recalled. The next day, the trial court stated that it would allow the Defendant to recall Mr. Crabtree to question him about the issue.

However, Mr. Crabtree apparently never returned to the trial court, and defense counsel asked to introduce into evidence court records regarding Mr. Crabtree's child support case. The records showed that, contrary to Mr. Crabtree's testimony that the child support case was dismissed because it was established that he was not the child's father, in July 2013 his case was continued until December 2013. In October 2013, Mr. Crabtree filed a petition to modify the child support amount alleging that he could not "afford to pay until approved [for] disability." The case was again continued in December 2013 until July 2014. The trial court denied the Defendant's request to admit the court records into evidence stating simply that it thought "it would be improper" to do so.

To the extent that the Defendant argues that the trial court prevented him from recalling Mr. Crabtree, the record belies this argument. The trial court specifically stated that it would allow the Defendant to recall Mr. Crabtree, and when Mr. Crabtree failed to appear in court, the Defendant did not request a continuance to attempt to locate him. As such, this argument is wholly unsupported by the record and lacks any merit. However,

-22-

the Defendant also argues that the State failed in its duty to correct Mr. Crabtree's false testimony.

"When a [S]tate witness answers questions on either direct or cross[-]examination falsely, the district attorney general, or his assistant, has an affirmative duty to correct the false testimony."[5]  State v. Spurlock, 874 S.W.2d 602, 617 (Tenn. Crim. App. 1993) (citing Giglio v. United States, 405 U.S. 150 (1972)).  In order to obtain a new trial, "the defendant must demonstrate that the State presented false testimony, the State knew the testimony was false, and the testimony was material."  State v. Cureton, 38 S.W.3d 64, 74-75 (Tenn. Crim. App. 2000).  The defendant bears the "burden of proving [the] allegations by a preponderance of the evidence."  Smith v. State, 757 S.W.2d 14, 19 (Tenn. Crim. App. 1988).

Here, there is no evidence that the State was aware that Mr. Crabtree's answers on cross-examination were false.  In fact, when defense counsel first raised this issue with the trial court, he said that the State did not know "anything about it at all."  Additionally, the court records presented by the Defendant end in December 2013, some four months before the trial in this matter.  While they call into question Mr. Crabtree's claim that he was relieved from his child support obligations, they do not preponderate against his claim, except to the extent that they proved that Mr. Crabtree was not relieved of his child support obligations in July 2013.

Additionally, Mr. Crabtree's possibly incorrect testimony that he was proven not to be the child's father in July 2013 was not material.  The court records presented by the Defendant "were merely additional evidence tending to undermine [Mr. Crabtree's] credibility."  United States v. Petrillo, 821 F.2d 85, 89 (2nd Cir. 1987).  Mr. Crabtree had already been cross-examined extensively about the fact that he was arrested for owing over $20,000 in unpaid child support and that he was released after serving only a few days of his sentence and shortly after speaking to Agent Friel about this case.  As such, the issues of Mr. Crabtree's credibility and his possible motivation to lie were squarely before the jury.  Furthermore, there was overwhelming evidence besides Mr. Crabtree's testimony supporting the Defendant's conviction; therefore, this case did not hinge on Mr. Crabtree's credibility.  Accordingly, we conclude that this issue is without merit.

*V. Bill of Particulars*

---

[5] Contrary to the State's argument in its brief that there was no showing that it had knowingly presented false testimony because "the State did not elicit this testimony," this rule "applies when the false testimony is given in response to questions propounded by defense counsel for the purpose of impeaching the witness" and "[w]hether the district attorney general did or did not solicit the false testimony is irrelevant."  State v. Spurlock, 874 S.W.2d 602, 618 (Tenn. Crim. App. 1993).

The Defendant contends that the State was allowed to argue a time of death that differed from the time of death provided in the bill of particulars. The Defendant argues that during the State's opening and closing arguments, the prosecutors argued that the victim was killed before noon when the bill of particulars stated that the offense occurred in the "[a]fternoon to evening hours." The Defendant argues that he was prejudiced by this because "the State was allowed to expand the time of death in their argument." The State responds that the Defendant has failed to show he was prejudiced by the variance between the State's argument and the bill of particulars.

Prior to trial, the Defendant filed three separate motions for a bill of particulars. The first motion requested that the State provide the "exact time and location of the offense," the "precise acts of the Defendant in the commission of the alleged offense," and the "precise cause of death of the victim." The second motion requested that the State "[s]pecify, as precisely as possible, any and all empirical data and method [sic] used to reach the State's conclusion in regards to cell phones and cell phone towers in this matter." The third motion requested that the State provide the "exact time of death of the victim." The State responded to the first motion by filing a bill of particulars listing the time of the offense as the "[a]fternoon to evening hours" of November 7, 2012. There is no response from the State in the record with respect to the Defendant's third motion for a bill of particulars providing an exact time of death.

During the State's opening statement, the prosecutor stated that when Ms. Miller saw the Defendant at approximately 12:30 p.m., the victim "had been murdered" and that the Defendant had returned to the victim's house "to stage the scene." During the State's closing argument, the prosecutor argued that the Defendant had attacked the victim sometime between 11:00 and 11:30 a.m. and that when he returned to the victim's house and was seen by Ms. Miller at 12:30 p.m., the Defendant discovered the victim was still alive and strangled her to death. The prosecutor then asked why the Defendant would call the victim at 1:16 p.m. if she were "dead at 11:30, 11:45." At the motion for new trial hearing, the prosecutor stated that this reference to the victim's being dead at 11:30 a.m. during the closing argument was simply a misstatement.

This court has previously held that the purpose of a bill of particulars "is to provide the accused with sufficient information about the offense alleged in the indictment to permit the accused (a) to prepare a defense, (b) to avoid prejudicial surprise at trial, and (c) to enable the accused to preserve a plea of double jeopardy." State v. Shropshire, 45 S.W.3d 64, 71 (Tenn. Crim. App. 2000). A variance between a bill of particulars "and the evidence presented at trial is not fatal unless it is both material and prejudicial." Id. A variance does not prejudice the defendant

(1) if the indictment sufficiently informs the defendant of the charges against him so that he may prepare his defense and not be misled or

surprised at trial, and (2) if the variance is not such that it will present a danger that the defendant may be prosecuted a second time for the same offense.

State v. Moss, 662 S.W.2d 590, 592 (Tenn. 1984). Other than the conclusory statement in his brief, the Defendant has offered no proof or argument that he was unable to prepare a defense or in danger of being prosecuted twice for this offense because the time of death argued by the State differed from the time of the offense provided in the bill of particulars. Because the Defendant has utterly failed to demonstrate how he was prejudiced, this issue is without merit.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE